COURT
OF APPEALS

                                         SECOND
DISTRICT OF TEXAS

                                                     FORT
WORTH

 

 

                                           NO.
2-08-014-CV

 

 

IN THE
INTEREST OF M.M.F., J.J.F., 

AND E.F.

 

                                                  ------------

 

             FROM THE
323RD DISTRICT COURT OF TARRANT COUNTY

 

                                                  ------------

 

                                  MEMORANDUM OPINION[1]

 

                                                  ------------

I.  Introduction








Appellant Michael F. appeals the trial court=s
judgment terminating his parental rights to his three childrenCMatt,
John, and Eric.[2]  In ten points, Michael argues that the
evidence is factually insufficient to support the trial court=s
endangering environment and endangering conduct findings, that the evidence is
factually insufficient to support the trial court=s best
interest finding, that the trial court abused its discretion by denying his
motion for continuance, that the trial court committed reversible error when it
admitted photographs without proper predicate, and that section 263.405 of the
Texas Family Code violates the Due Process Clause, the Equal Protection Clause,
and the separation of powers doctrine. 
We will affirm.

II.  Factual and Procedural Background

Melisa and Michael are the biological parents of
Matt, John, and Eric.  At the time of
trial, Matt was four, Molly was three,[3]
John was two, and Eric was one and a half. 
Because Melisa did not perfect an appeal from the judgment terminating
her parental rights, we limit our discussion of the facts to those that are
pertinent to Michael=s appeal of the termination of
his parental rights.

A.     Previous CPS History

On July 9, 2003, CPS received a referral alleging
physical neglect and physical abuse of Matt by Melisa because she was bipolar
and was not taking her medication.  CPS
gave the case a disposition of Areason
to believe@ and instituted a safety plan,
which Michael signed, stating that Melisa would have no unsupervised contact
with the child.








The next referral came in on December 24, 2003,
and involved allegations of physical neglect and medical neglect.  Michael and Matt were staying at the
Salvation Army, and Michael was not cooperative with the program; he appeared
volatile and unstable.  Matt had an open
lesion on his left ankle; hard, cracked skin over his body; and a distended
abdomen.  CPS ruled out that case. 

On May 23, 2005, a referral came in for physical
neglect and neglectful supervision of Matt and John by Melisa.  The referral came in after Melisa gave birth
to John because there was a concern regarding her ability to properly care for
him due to her diagnosis of bipolar disorder and her inclination not to take
her medication.  CPS ruled out that case
but left it open for services to be provided through Catholic Charities. 

On February 6, 2006, a referral came in for
physical neglect of Matt, Molly, and John by Michael and Melisa.  The allegations included a dirty kitchen,
dirty clothes throughout the home, and John was yellow and had his hands bound
with a piece of rag, possibly to keep him from scratching his skin.  All three children were seen at Cook Children=s
Medical Center.  Molly and Matt had no
problems.  John, however, had a skin
condition, and his weight was just below the fifth percentile.  All three children were sent home with Michael
and Melisa, along with a safety plan. 
CPS ruled the case reason to believe for medical neglect and ruled out
the allegations of physical neglect.  








Even though a case was opened in May 2006 for
family based safety services, the Department went a number of months without
seeing the children because Michael, Melisa, or both would not allow anyone
from the Department to see any of the children. 
Because Michael and Melisa were not cooperative with CPS and would not
allow family, friends,[4]
or professionals to enter their home to see their children, the court signed an
order providing services for the family on January 30, 2007. 

B.      The February 1, 2007 Psych Call








Two days later, Shawn Burton, a paramedic with
MedStar, received a psych call.[5]  He responded to the call and found Melisa[6]
in the kitchen working on family scrapbooks. 
He noticed a child, Eric, in a car seat or carrier on the kitchen
counter and three children in the living room. 
When Burton and another paramedic removed the layers of blankets that
were on Eric, they saw that he was severely malnourished, that he had almost no
musculature, that he was very dehydrated, that his eyes were sunken in, that he
was covered in eczema, and that his arms had been wrapped behind his back.  

The paramedics questioned Melisa about why Eric=s arms
were secured behind his back, and she said that it was to keep him from
scratching.  She also told them that Eric
had eaten five times that day, and then she took an almost-empty box of dry
cereal out of the refrigerator to make her point.  However, they did not find anything that
would confirm that Eric had eaten during the day, and Melisa was unable to show
them any bottles anywhere in the house. 
They found no food in the cabinets and little to no food in the
refrigerator.  Burton checked on the
three other children, who were all under the age of four, and noted that they
were well fed and were playing in the living room. 








They explained to Melisa the seriousness of Eric=s
condition and that they were going to take him to the hospital.  They also notified the police to come
interview Melisa.  Melisa was not
cooperative and did not want them to take Eric. 
She told them that she did not think it was a good idea and that she
wanted her husband to make the decision. 
So they called Michael and explained that they needed to take Eric to
the hospital.  He, too, was not
cooperative at first and told them that he would take Eric to the doctor the
next day.  They explained that due to the
seriousness of Eric=s condition, they Awere
going to have to take him anyways.@  Michael finally agreed. 

Burton=s
partner took Eric to the ambulance and began working on him while they waited
for the police to arrive and look after the children because Melisa was
agitated and not alert to what was going on. 
The neighbors told him that Melisa does not take her medicine.  When he asked Melisa whether she had taken
her medicine, she would not answer. 

C.     Eric=s
Hospitalization

Dr. Jayme Coffman, who was qualified as an expert
on child abuse because she is a pediatrician and medical director of the Care
Team (the child abuse program at Cook Children=s
Medical Center), testified that she came into contact with Eric on February 2,
2007, when she was asked to consult on his case.  Eric had been admitted to the pediatric
intensive care unit the day before and was severely malnourished.  








Dr. Coffman testified that Eric, who was seven
and a half months old, weighed 3.8 kilograms or a little over 8 pounds; had no
body fat; had a sodium level of 115, which is incompatible with life; and had Asevere,
severe eczema.@ 
Eric was Away off the growth charts, not
only on weight, but on length and head size as well@ and had
been starved long enough for it to affect his length and brain growth.  Dr. Coffman testified that this was not an
overnight process that caused Eric=s body
to quit growing and his brain to atrophy. 
She further testified that Eric did not have a preexisting medical
condition that caused this, that his condition was the result of someone not
feeding him, and that his condition was obvious enough that it could be
observed with the naked eye.  Dr. Coffman
said that Eric presented with Athe
worst case of malnourishment that [she had] seen that survived@ and
determined that his condition was abuse due to severe malnutrition and
starvation.  

Dr. Coffman said that Eric was in the hospital a
couple of weeks because Awhen they=re that
malnourished, it=s difficult to refeed them.  Their gut is not used to the food, and so it=s
difficult to get them to eat again, basically, and to absorb the nutrition.@  So they reintroduced food slowly and diluted
it so that his intestines could learn to deal with normal nutrition.  








Dr. Coffman testified that at the time of trial,
Eric was a typical kid who may have some special educational needs.  Her main concern for Eric, based on his brain
atrophy, is future learning difficulties or developmental delays.  She said that he will need lots of
developmental assistance through early childhood and Head Start, but even with
that, she was not sure that he could reach the potential that he would have had
if he had not been starved.  He does not
require special living circumstances, only someone who will keep up with
appointments and be aggressive in following through to make sure that Eric gets
his educational needs met. 

Dr. Coffman looked at previous emergency room
visits during which one of Eric=s older
siblingsCJohnCwas
diagnosed as Afailure to thrive [malnourished]
with eczema@ and noted that Eric=s
medical records stated that Eric=s mother
and father were his primary caregivers. 
Dr. Coffman therefore felt that it was appropriate that CPS remove the
children.  Dr. Coffman said that she
would have concerns if Eric was returned to the caregivers who had allowed him
to get into the state he was in. 

D.     The Department=s
Investigation

Stephanie Nick, formerly an investigator with the
Department, testified that on February 1, 2007, the Department received a
referral that alleged medical neglect and physical neglect of Eric by both of
his parents.  She met with law
enforcement and went to the residence, where she met Melisa and her three older
children.  When Nick arrived at the home,
she noticed signs of violence, including that the screen on the front porch had
been smashed, that the living room had a broken window, and that there were
holes in the walls throughout the home, but Melisa would not permit her to take
any photographs.  








Melisa told Nick that she fed Eric several times
a day, that she breastfed him, that he ate Enfamil with iron, and that he also
ate baby cereal and jars of baby food. 
Melisa showed Nick the box of Beachnut baby cereal, a couple of
containers of baby food, and an unopened, three-pack of bottles.  

Nick also observed the older children while she
was at the home and noted that Matt and John exhibited developmental
delays.  John was in the corner and not
playing with the others, and Matt was three and a half and was not potty-trained
and said only the word Acar.@  Nick removed the children from the home later
that day because Eric, who was seven and a half months old and weighed only
eight and a half pounds, had been transported to the hospital.  This indicated to Nick that Eric was not being
fed appropriately, so she ruled the case as reason to believe for neglectful
supervision of Eric, John, Molly, and Matt by both parents and reason to
believe for physical neglect and medical neglect of Eric by both parents. 

Nick went to the hospital on February 2 to see
Eric.  At that time, his dry, flaky skin
was hanging from his bones.[7]  She held him during his diaper changes, and
she could see the lymph nodes in his groin. 
He appeared to be very uncomfortable. 








Nick interviewed Michael on February 2, and he
said that Melisa has a mental condition and a history of not taking her
medications.  He said that her medicines
were kept in the cabinet and that he Akind of
forgot about them.@ 
He said that Melisa was responsible for the children during the day
while he worked and that he provides care to Eric after he returns home from
work in the evenings, during the night, and on the weekends.  Michael said that he would feed Eric several
times during the evening hours and that he was eating up to eight ounces at a
time.[8]  Nick asked both Michael and Melisa about how
Eric got into the condition he was found in, and both were adamant that they
had been feeding him on a regular basis. 








Michael told Nick that he wanted a home study
performed on Melisa=s parents.  When Nick met with Melisa=s dad,
he told Nick that he suspected domestic violence between Melisa and Michael and
that an altercation had occurred between Michael and Melisa=s
mom.  Nick also learned during the
interview with Melisa=s dad that he had been in the
home approximately twice a week to pick up Molly.  Melisa=s dad
said that when he had seen Eric the last weekend in January, he was covered in
blankets, but his face was thin.  Melisa=s dad
told Nick that he had seen both Michael and Melisa feed Eric cereal and baby
food.  However, it concerned Nick that
Melisa=s dad
knew of his daughter=s mental health issues and her
propensity to not take her medicine, that he was in the home on a regular
basis, and that he did not report Eric=s
looking thin. 

During Nick=s
investigation, she discovered that this family had an extensive history with
CPS.  She requested a criminal history,
and what she learned about Michael factored into the reasons for the removal of
the children.[9]  Nick felt that removal of the children was
appropriate because the family had not been cooperative in the past and because
she had very serious concerns about the parents= present
ability to care for and protect their children. 
The Department felt that removal of all four children from Michael and
Melisa was in the children=s best
interest. 

E.      The Caseworker=s
Observations

Christie Weaver, the ongoing caseworker for the
children in this case, testified that she met with Melisa.  During the meeting, Melisa threatened to beat
her up, and the children behaved timidly around her, though Weaver never saw
her strike at them.








Weaver also met with Michael, and gave him a
service plan.  He completed his
psychological evaluation, which diagnosed him as having an adjustment
disorder.  The psychological evaluation
recommended that Michael enroll in individual supportive counseling for
adjustment issues, that he participate in parenting class, that he enroll in
GED classes, and that his probation officer be contacted for treatment plan
purposes.[10]  Michael did subsequently obtain a certificate
for completing parenting classes.  He
failed, however, to complete his service plan because he did not undergo a
psychiatric evaluation, participate in individual and family counseling, or
submit to a drug test.[11]  








Michael visited regularly with the children and
missed only three or four visits.  Weaver
noted that there were several occasions when Michael did not engage the
children and when he would read a magazine during the visit.  At one visit, he pushed John away and told
him to go bother someone else.  During a
visit in July 2007, he threatened to spank John and reached down as though he
were taking off his belt.  Later during
the visit, Michael became agitated when Matt and John started throwing balls at
him, and he took their hands and squeezed them. 
Weaver described the rest of the visit as follows:

And then after -- after
about 30 minutes in the visit, [Michael] took a toy away from [Matt] and [Matt]
teased [Michael] saying, AI got the toy.  I got the toy.@  And [Michael] took the toy away from him and
he glared at [Matt] and [Matt] yelled at his father three times to shut up,
each time getting louder.

 

And [John] said something to [Matt] and [Michael] said, AYou tell him, Son.@ And [Matt] then looked
at his father and called him a fucker. 
And at that point [Michael] reached out and grabbed [Matt] by the shirt
and jerked him towards him.  And at that
point I interrupted the visit and asked [Michael] to leave. 

 

After that visit, CPS took precautions to have two observers and to
have a male caseworker in the hallway or in the adjacent rooms every time that
Michael visited.  Additionally, after a
bonding assessment was completed, the visits were reduced to once a month due
to Michael=s behaviors, the chaos that they
created with the children, and the after-effects on the children following
visits with Michael. 








Currently, Matt and Molly are together in a
foster home, and John and Eric are together in another foster home.  Both Molly and Matt were nonverbal when they
came into care, and now they are able to communicate effectively.  Molly has been potty-trained, and Matt is attending
Head Start, where he is learning his ABCs. 
The one concern noted in Matt=s
service plan was that he had shown possible signs of sexual abuse. 

Eric and John are progressing more slowly.  Eric went from a little over eight pounds in
February 2007 to twenty-four pounds at his birthday in June 2007.  Eric is in occupational therapy and works
with Early Childhood Intervention.  Eric
is seeing a doctor regularly to relearn how to use the muscles that allow him
to swallow.  Due to Eric=s
swallowing problems, his food has to be prepared so that he will not aspirate
or choke on what he eats or drinks. 

Like Eric, John has shown signs of severe
neglect.  Generally, John is fairly quiet
and reserved.  However, he can be
extremely aggressive and violent and has directed that behavior toward Eric and
other children.  Weaver testified that,
in her opinion, John has serious emotional problems.  John has been diagnosed with reactive attachment
disorder, which is a life-long disorder, and he is in therapy with a therapist
at the University of North Texas.  John
was also diagnosed with post-traumatic stress disorder and struggles with
attachment issues in that he attaches to inappropriate caregivers, such as
people whom he has been with for only fifteen or twenty minutes. 








Weaver=s
concerns for the scenario of returning the children to their parents are that
the children will be neglected, that Eric will not be fed, that the children
will not be cared for appropriately, and that they will again witness domestic
violence in the home.  Weaver therefore
recommended that the trial court terminate the parental rights of Michael and
Melisa and testified that termination was in the children=s best
interest.  Weaver believed it would be
good for all four children to be placed together, but the Department=s
current plan was to place two of the children with one home and the other two
children in another home.  Weaver asked
that the trial court name the Department as the managing conservator of the
children.  Weaver said that the
permanency plan for the children is for them to be adopted. 

F.      CASA=s
Observations and Recommendation

Teresa Schultz, the court appointed special
advocate for the children, said that Michael=s
initial visits with Molly, Matt, and John Adidn=t go
well at all.@ 
It appeared that Michael did not know how to interact with the children,
so they each stayed by themselves.  She
described the visits as Atorture@ and
felt that the children suffered when they spent time with Michael because they
showed signs of emotional distress. 
Schultz said that Michael=s
behavior at the visits improved as time went on.  He seemed to apply what he had learned in his
parenting classes and seemed to interact better with his children. 








Schultz also observed the first visit that Eric
was taken to[12]
and said that Eric handled it well after some initial timidity.  During that visit, Michael interacted with
all of the children and gave Eric a bottle and sang or read to him.  Michael changed one of Eric=s dirty
diapers during that visit and also made the caseworkers aware of Molly=s issues
in going to the restroom. 

Schultz recommended terminating the parental
rights of all three parents in this case. 
Schultz said that Molly and Matt are bonded together and that John and
Eric are bonded together.  Schultz thinks
that all four children should be together, but if they cannot be together, the
current groupings should be maintained. 

G.     The Ad Litem=s
Recommendation

Sylvia Andrews, the ad litem for the children,
recommended that the trial court terminate the parental rights of all three
parents, that Melisa=s parents be named temporary
managing conservators of Molly and Matt, and that John and Eric remain in the
foster home where they are currently residing. 

 

 

 








         H.     Trial Court=s
Disposition

After hearing the above evidence and reviewing
the medical records from Cook Children=s
Hospital and MedStar, as well as Melisa=s
records from John PeterSmith Hospital, the trial court stated on the record:

With respect to the
evidence of [Michael,] he had some -- had some culpability in this matter.  We have the testimony of Shawn Burton from
MedStar who says when he entered the house that one of the things that they did
was call [Michael] at work.  He objected
to the removal of the child by MedStar EMTs. 

 

We have the testimony of the caseworker where [Michael] told her that
he provided the care for [Eric] every night when he got off work and [Eric]
drank eight ounces of formula and he had given him eight ounces just the night
before.

 

So the long and the short of it is there is every indication the --
and -- and we have the evidence that the grandparents had -- had been cut out
of any real relationship because of [Michael]. 
There had been an altercation with [Michael].  Certainly I think that his contact has been
substantial.

 

He is the one who went to the hospital when [Eric] was
hospitalized.  He says that the mother
has a history of not taking her meds. 
And we have the history in the case of -- there is a long CPS
involvement with this -- with this family going all the way back to the  -- to [Matt=s] birth. 

 








The trial court thus found by clear and convincing evidence that Michael
had knowingly placed or knowingly allowed his children to remain in conditions
or surroundings that endangered the physical or emotional well-being of the
children, that he had engaged in conduct or knowingly placed the children with
persons who engaged in conduct that endangered the physical or emotional
well-being of the children, and that termination of the parent-child
relationship was in the children=s best
interest.  The trial court therefore
terminated the parent-child relationship between Michael and Matt, John, and
Eric.[13]  This appeal followed.

III.  Constitutional Challenges








In his sixth through tenth points, which we will
address first, Michael argues that section 263.405 of the Texas Family Code
violates his right to due process and equal protection and that the statutory
scheme contained in section 263.405 violates the separation of powers provision
of the Texas constitution.  Because the
trial court granted Michael=s motion
to extend the time for filing his statement of points listing the issues raised
on appeal, we need not consider these constitutional challenges.  See In re T.H., No. 02-07-00464-CV,
2008 WL 4831374, at *9 (Tex. App.CFort
Worth Nov. 6, 2008, no pet. h.) (mem. op.); In re O.L.A., No.
02-06-00321-CV, 2008 WL 706335, at *8 (Tex. App.CFort
Worth Mar. 13, 2008, no pet.) (mem. op.).[14]  We overrule Michael=s sixth
through tenth points.

IV.  Burden
of Proof and Standard of Review








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the
Department seeks not just to limit parental rights but to end them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon Supp. 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re E.M.N., 221
S.W.3d 815, 820 (Tex. App.CFort
Worth 2007, no pet.).

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the Department
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. ' 161.001
(Vernon Supp. 2008); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).








Termination of parental rights is a drastic
remedy and is of such weight and gravity that due process requires the
petitioner to justify termination by clear and convincing evidence.  Tex. Fam. Code Ann. ''
161.001, .206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the
preponderance standard of ordinary civil proceedings and the reasonable doubt
standard of criminal proceedings.  In
re G.M., 596 S.W.2d 846, 847 (Tex. 1980); In re C.S., 208 S.W.3d 77,
83 (Tex. App.CFort Worth 2006, pet.
denied).  It is defined as the Ameasure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be established.@  Tex. Fam. Code Ann. ' 101.007
(Vernon 2002).

In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s findings
and not supplant the judgment with our own. 
In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire
record, a factfinder could reasonably form a firm conviction or belief that the
parent violated section 161.001(1)(D) or (E) and that the termination of the
parent=s
parental rights would be in the best interest of the child.  C.H., 89 S.W.3d at 28.  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108. 

V.  Factually Sufficient Evidence of Endangerment

In his first and second points, Michael argues
that the evidence is factually insufficient to establish that he endangered his
children.  The Department argues that
there is factually sufficient evidence to support the trial court=s
endangerment findings under subsections (D) and (E) of section 161.001(1) of
the family code. 













Endangerment means to expose to loss or injury,
to jeopardize.  Boyd, 727 S.W.2d
at 533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.); see also In re M.C., 917 S.W.2d 268, 269 (Tex.
1996).  To prove endangerment under
subsection (D), the Department had to prove that Michael (1) knowingly (2)
placed or allowed his children to remain (3) in conditions or surroundings that
endangered their physical or emotional well‑being.  See Tex. Fam. Code Ann. '
161.001(1)(D).  Under subsection (E), the
relevant inquiry is whether evidence exists that the endangerment of the
children=s
physical well‑being was the direct result of Michael=s
conduct, including acts, omissions, or failures to act.  See J.T.G., 121 S.W.3d at 125;
Tex. Fam. Code Ann. ' 161.001(1)(E).  Additionally, termination under subsection
(E) must be based on more than a single act or omission; a voluntary,
deliberate, and conscious course of conduct by the parent is required.  J.T.G., 121 S.W.3d at 125; see Tex.
Fam. Code Ann. ' 161.001(1)(E).  However, it is not necessary that the parent=s
conduct be directed at the children or that the children actually suffer
injury.  Boyd, 727 S.W.2d at 533; J.T.G.,
121 S.W.3d at 125.  The specific danger
to the children=s well‑being may be
inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.CFort
Worth 2004, pet. denied).  To determine
whether termination is necessary, courts may look to parental conduct occurring
both before and after the children=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).

Stability and permanence are paramount in the
upbringing of children.  See In re
T.D.C., 91 S.W.3d 865, 873 (Tex. App.CFort
Worth 2002, pet. denied).  A factfinder
may infer from past conduct endangering the well‑being of the children
that similar conduct will recur if the children are returned to the
parent.  See In re D.L.N., 958
S.W.2d 934, 941 (Tex. App.CWaco
1997, pet. denied), disapproved on other grounds by J.F.C., 96
S.W.3d at 256, and C.H., 89 S.W.3d at 17.  Evidence of criminal conduct, convictions,
and imprisonment prior to the birth of a child will support a finding that a
parent engaged in a course of conduct that endangered the child=s
well-being.  J.T.G., 121 S.W.3d at
133.

The record contains substantial evidence of
subsection (D) environmental endangerment and subsection (E) course of conduct
endangerment to the physical or emotional well‑being of the
children.  Because the evidence
concerning these two statutory grounds for termination is interrelated, we
consolidate our examination of it.  See
J.T.G., 121 S.W.3d at 126.








The record demonstrates that Michael allowed
Melisa to parent the children during the day even though he was aware that she
did not take her bipolar medications. 
The record also demonstrates that Michael prevented family, friends, and
professionals from seeing Eric and initially denied MedStar permission to take
Eric to the hospital.  Michael=s
testimony that he was feeding Eric multiple times in the evenings and that he
took a full bottle was contradicted by the medical records, testimony, and
photographs that revealed  Eric=s
malnourished body.  And medical records
showed that John was also suffering from malnourishment.

The record also reveals that there were domestic
violence issues between Michael and Melisa, which the children witnessed.  The record further reveals that Michael had a
criminal history that included a conviction for criminal mischief.  And at one point during the case, Matt=s
service plan stated that he showed signs of possible sexual abuse. 








We have carefully reviewed the entire record.  Giving due deference to the trial court=s
findings, we hold that a reasonable trier of fact could have formed a firm
belief or conviction that Michael knowingly placed Matt, John, and Eric in
conditions and engaged in conduct that endangered the children=s
physical or emotional well‑being.  See
Tex. Fam. Code Ann. ' 161.001(1)(D), (E); J.F.C.,
96 S.W.3d at 265B66; C.H., 89 S.W.3d at
25; J.T.G., 121 S.W.3d at 124; In re S.G.S., 130 S.W.3d 223, 238
(Tex. App.CBeaumont 2004, no pet.) (holding
that evidence was legally and factually sufficient to support endangerment
finding when evidence showed that mother and father failed to feed one child
adequate nutrition; jury could infer that actual harm to one child meant that
the physical and emotional well-being of other children in same house were also
jeopardized); see also In re M.R., 243 S.W.3d 807, 819 (Tex. App.CFort
Worth 2007, no pet.) (holding that record contained legally and factually
sufficient evidence of both endangerment grounds when, among other things, it
showed that mother exposed children to domestic violence and refused to
participate in her CPS service plan). 
Accordingly, we hold that the evidence is factually sufficient to
support the trial court=s findings on environmental
endangerment and course of conduct endangerment.  We overrule Michael=s first
and second points.

VI.  Termination Was In The Children=s Best
Interest

In his third point, Michael argues that the
evidence is factually insufficient to support the trial court=s
finding that termination of his parental rights was in the children=s best
interest.  The Department argues that the
evidence is factually sufficient to support the trial court=s Abest
interest@
finding. 








Prompt and permanent placement of the child in a
safe environment is presumed to be in the child=s best
interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2002).  There is also
a strong presumption that keeping a child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:  (1)
the desires of the child; (2) the emotional and physical needs of the child now
and in the future; (3) the emotional and physical danger to the child now and
in the future; (4) the parental abilities of the individuals seeking custody;
(5) the programs available to assist these individuals to promote the best
interest of the child; (6) the plans for the child by these individuals or by
the agency seeking custody; (7) the stability of the home or proposed
placement; (8) the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and (9) any
excuse for the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex.
1976).  

These factors are not exhaustive; some listed
factors may be inapplicable to some cases; other factors not on the list may
also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.








Regarding the first factor, the children did not
testify at trial.  However, the evidence
demonstrated that there were very serious concerns about Michael=s
ability to parent and that the children did not want to leave their foster
parents to attend visits with Michael. 
The record also revealed that the children are attached to and bonded
with their foster parents. 

Regarding the second factorCthe
children=s
present and future physical and emotional needsCDr.
Coffman testified that Eric will need lots of developmental assistance through
early childhood and Head Start.  Weaver
said that Eric is seeing a doctor regularly to relearn how to use the muscles
that allow him to swallow and that due to Eric=s
swallowing problems, his food has to be prepared so that he will not aspirate
or choke on what he eats or drinks.  John
has been diagnosed with reactive attachment disorder, which is a life-long
disorder, and he is in therapy with a therapist at the University of North
Texas.  John was also diagnosed with
post-traumatic stress disorder and struggles with attachment issues in that he
attaches to inappropriate caregivers, such as people whom he has been with for
only fifteen or twenty minutes.  Matt is
attending Head Start, where he is learning his ABCs. 

The environmental endangerment and endangering
course of conduct discussion above addressed the third, fourth, and eighth
factorsCthe
present and future physical and emotional dangers to the children, as well as
Michael=s
parenting abilities, or lack thereof, and his acts and omissions.








Concerning the fifth factor, Michael attempted to better himself by
attending parenting classes.  However, he
did not take advantage of other services that were offered to him.

Regarding the parties= plans
for the childrenCthe sixth factorCMichael
did not list his plans for the children, though it can be presumed from the
filing of his appellate brief that he wanted the children returned to him.  Weaver, the ongoing case worker, testified
that the Department=s plan is for the children to be
adopted.  Schultz, the CASA worker,
testified that all four children should be together, but if they cannot be
together, the current groupings should be maintained.  Sylvia Andrews, the ad litem for the
children, recommended that Melisa=s
parents be named temporary managing conservators of Molly and Matt and that
John and Eric remain in the foster home where they are currently residing. 

Regarding the stability of the proposed placementCthe seventh
factorCthe
evidence demonstrated that terminating Michael=s
parental rights would allow CPS to pursue adoptive placements for the children,
which would allow them to have the stability lacking in their current
situation. 

Finally, concerning the ninth factorCany
excuse for the parents= acts or omissionsCMichael
was adamant that he had been feeding Eric and did not accept any blame for the
condition in which Eric was found. 








Giving due consideration to evidence that the
factfinder could have reasonably found to be clear and convincing, and based on
our review of the entire record, we hold that a reasonable trier of fact could
have formed a firm belief or conviction that the termination of Michael=s
parental rights would be in the children=s best
interest.  See S.G.S., 130 S.W.3d
at 239B41
(holding that clear and convincing evidence existed that termination of mother=s and
father=s
parental rights was in children=s best
interest when, among other factors, children suffered severe health problems
and significant developmental delays while in their care and parents did not
utilize services to maintain a stable living environment); see also In re
J.L.W., No. 02-08-00179-CV, 2008 WL 4937970, at *9B10 (Tex.
App.CFort
Worth Nov. 20, 2008, no pet. h.) (mem. op.) (holding that evidence was legally
and factually sufficient to support trial court=s best
interest finding when evidence revealed that returning child to mother would
risk child=s emotional and physical
well-being because of couple=s past
history of domestic abuse and because of mother=s
inability to care for any of her four children).  Accordingly, we hold that the evidence is
factually sufficient to support the trial court=s
best-interest finding.  We overrule
Michael=s third
point.

 

 








VII.  Motion for Continuance Properly Denied

At the beginning of the termination trial on
December 17, 2007, the trial court heard Michael=s motion
for continuance, which he had filed that same day.  Michael argued that a continuance was needed
because he had a psychiatric evaluation scheduled for December 19.  The Department responded by reminding the
trial court that there had been a hearing on October 1, 2007, which addressed
the issue of Michael=s getting a psychiatric
evaluation, and that he had failed to comply with the trial court=s order
giving him thirty days to undergo the evaluation.  The trial court thereafter denied Michael=s motion
for continuance. 

In his fourth point, Michael argues that the
trial court abused its discretion by denying his motion for continuance, which
he sought in order to obtain a psychiatric evaluation to comply with his family
reunification plan.  The Department
responds that the trial court properly overruled Michael=s motion
for continuance. 








We review a trial court=s ruling
granting or denying a motion for continuance for an abuse of discretion.  See BMC Software Belg., N.V. v. Marchand,
83 S.W.3d 789, 800 (Tex. 2002).  To
determine whether a trial court abused its discretion, we must decide whether
it acted without reference to any guiding rules or principles; in other words,
whether the act was arbitrary or unreasonable. 
Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241B42 (Tex.
1985), cert. denied, 476 U.S. 1159 (1986).  Whether the trial court grants or denies a
motion for continuance is within its sound discretion.  See BMC Software, 83 S.W.3d at 800; Villegas
v. Carter, 711 S.W.2d 624, 626 (Tex. 1986); see also In re E.L.T.,
93 S.W.3d 372, 374 (Tex. App.CHouston
[14th Dist.] 2002, no pet.).  The trial
court=s action
in denying a continuance will not be disturbed unless the record discloses a
clear abuse of discretion.  State v.
Wood Oil Distrib. Inc., 751 S.W.2d 863, 865 (Tex. 1988).

A motion for continuance shall not be granted
except for sufficient cause supported by an affidavit, consent of the parties,
or by operation of law.  Tex. R. Civ. P.
251.  If appellant provides no record of
the evidence presented to the trial court, we must presume that the evidence
supports the ruling.  See Wil-Roye
Inv. Co. II v. Wash. Mut. Bank, F.A., 142 S.W.3d 393, 401 (Tex. App.CEl Paso
2004, no pet.); In re Guardianship of Berry, 105 S.W.3d 665, 667 (Tex.
App.CBeaumont
2003, no pet.).








Here, the record demonstrates that the trial
court=s
October 1, 2007 order required Michael to Aattend,
participate in, and follow the recommendations of a psychiatric evaluation.@  The trial court further ordered that Athe
psychiatric evaluation for MICHAEL [F.] be arranged by and paid for by the
Department of Family and Protective Services within the next thirty (30) days.@  More than thirty days elapsed during which
Michael failed to comply with the trial court=s
order.  Although the Department argues in
its brief that CPS had previously arranged the required psychiatric exam for
Michael on October 1, 2007, and that he missed the appointment, the Department
does not point to any place in the record supporting its argument.  At the hearing, the Department stated only
that Michael had failed to undergo a psychiatric evaluation Ain
compliance with the Court order within 30 days, which the Department had arranged
for him to do.@ 
Michael did not dispute this, nor did he put on evidence showing why he
had been unable to comply with this provision of his service plan prior to the
termination trial.  As Michael notes in
his brief to this court, AThe record, however, is
absolutely silent on the reason for the delay in securing the psychiatric
evaluation.@ 








Under these facts, we cannot conclude that the
trial court abused its discretion by denying Michael=s
continuance for more time to complete his service plan.  See D.B., No. 02-07-00428-CV, 2008 WL
2553343, at *6 (Tex. App.CFort Worth June 26, 2008, no
pet.) (mem. op.) (holding that trial court did not abuse its discretion by
denying appellant=s motion for continuance when he
had four months= notice of trial setting but
waited until day of termination trial to file motion for continuance and did
not claim that he was unprepared for trial); see also In re S.W., No. 02‑08‑00164‑CV,
2008 WL 4531711, at *3 (Tex. App.CFort
Worth Oct. 9, 2008, no pet.) (mem. op.) (holding that when parent chooses to
travel out of state and neglect her service plan and then at the time of the
termination trial requests a continuance in order to complete the plan, the
trial court does not abuse its discretion by denying a continuance).

Moreover, we note that even if Michael had been
granted more time to complete his service plan, he cannot demonstrate that the
result of the termination trial would have changed because his parental rights
were not terminated for failing to complete his service plan but instead were
terminated for other statutory reasons.  See
generally Tex. Fam. Code Ann. ' 161.001(1)(O)
(listing as a separate ground, not linked to endangerment, the failure to
comply with the provisions of a court order that specifically established the
actions necessary for the parent to obtain the return of the child).  For this reason as well, the trial court did
not abuse its discretion by denying Michael=s motion
for continuance.  Cf. In re H.B.,
No. 02-06-00102-CV, 2006 WL 3438193, at *2 n.6 (Tex. App.CFort
Worth Nov. 30, 2006, no pet.) (mem. op.) (stating that given counsel for the
Department=s representation that he was
proceeding on AD and E@
grounds, not on the added mental health grounds, no abuse of discretion
occurred when the trial court denied appellant=s motion
for continuance).








Furthermore, Michael=s
written motion failed to comply with rule 251 because it was not supported by
verification or affidavit, and the trial court could have properly denied the
motion on this ground as well.  See Tex.
R. Civ. P. 251; In re J.A., No. 02-05-00454-CV, 2006 WL 3114434, at *9
(Tex. App.CFort Worth Nov. 2, 2006, no
pet.) (mem. op.) (holding that trial court did not abuse its discretion by
denying appellant=s motion for continuance because
appellant did not comply with rule 251 when he requested a continuance without
a supporting affidavit).  We therefore
overrule Michael=s fourth point.

VIII.  Photographs Properly Admitted

In his fifth point, Michael contends that the
trial court committed reversible error by admitting exhibits containing
photographs for which the proper evidentiary predicate had not been laid.  Specifically, Michael contends that the
sponsoring witness, through whom the photographs were admitted, failed to
address whether the photographs had been altered.  The Department responds that the exhibits
were properly admitted. 








The Department attempted to introduce into
evidence exhibits 6 through 15 through Stephanie Nick, a former investigator
with the Department.  Nick testified that
the exhibits contained photographs of Eric that had been taken on February 1,
2007, and that the photographs fairly and accurately portrayed what he looked like
when she saw him on February 2, 2007. 
Michael objected on the basis that the proper predicate had not been
established, and the trial court allowed the Department to go back through its
predicate again.  The Department
complied, and Michael reiterated his objection. 
The trial court sustained Michael=s
objection.  The Department thereafter
questioned Nick in more detail:

Q.  (BY MS. MILOUD) Ms. Nick, I=m again handing you what=s been marked as
Petitioner=s Exhibits 6 through 15.

 

A.  Uh-huh.

 

Q.  You=re familiar with how
[Eric] looked on the 2nd day of February 2007; is that correct?

 

A.  Yes, ma=am.

 

Q.  And do these pictures
reflect what he looked like on that date to you?

 

A.  Yes, ma=am.

 

Q.  Okay.  And they were taken on the 1st, but he looked
B he was in this condition
when you saw him on the 2nd; is that correct?

 

A.  Yes, ma=am.

 

Q.  Okay.  To your knowledge, you have had these
pictures in your custody; is that correct?

 

A.  Yes.  They have been in my case file.

 

Q.  Okay.  And do you know if they have been altered in
any way to not clearly, accurately reflect what you saw on that day in the
hospital?








A.  I don=t believe they have been
altered, no.

 

Q.  Okay.  So this is what he looked like on that date;
is that correct?

 

A.  Yes, ma=am.

 

Q.  And you can identify every
one, 6 through 15, as the same child and what he looked like on that date?

 

A.  Yes, ma=am. 

 

Michael thereafter took Nick on voir dire and asked whether she was
present when the photographs were taken, whether she was present when they were
developed, whether she knew the name of the person who took them, and whether
she really knew whether they had been altered. 
At the conclusion of the voir dire, Michael objected again that the
proper predicate had not been established and that there was a break in the
chain of custody.  The Department
responded that the chain of custody did not need to be established in a civil
suit such as this one and that the rules of evidence do not require that the
photographer be called in order to admit the pictures.  The trial court overruled the objections and
admitted Petitioner=s Exhibits 6 through 15.  Michael made similar objections when the
Department attempted to admit exhibits 16 and 17, which were photographs of
Eric on his first birthday.  The trial
court admitted the photographs over Michael=s
objections. 








The admission or exclusion of evidence is left to the trial court=s sound discretion. See City of Brownsville v. Alvarado, 897
S.W.2d 750, 753 (Tex. 1995); Fort Worth Hotel Ltd. P=ship v.
Enserch Corp., 977 S.W.2d 746, 757 (Tex. App.CFort
Worth 1998, no pet.).  AAdmissibility
of a photograph is conditioned upon its identification by a witness as an
accurate portrayal of the facts, and on verification by that witness or a
person with knowledge that the photograph is a correct representation of such
facts.@  Davidson v. Great Nat=l Life
Ins. Co., 737 S.W.2d 312, 314B15 (Tex.
1987); see also Tex. R. Evid. 901(b)(1) (stating that all that is
necessary is testimony from a witness with personal knowledge that the
photograph accurately depicts what it claims to be).  The authentication requirement is Asatisfied
by evidence sufficient to support a finding that the matter in question is what
its proponent claims.@ 
Tex. R. Evid. 901(a).








Under the above rules, Nick need not have taken
the photographs or observed them being taken in order to testify about
them.  See Kessler v. Fanning, 953
S.W.2d 515, 522 (Tex. App.CFort
Worth 1997, no pet.) (stating that Apredicate
for admissibility need not be laid by the photographer, the person
photographed, or even a person who was present when the photograph was taken@).  She testified that the pictures accurately
depicted Eric=s condition on the date that she
saw him.  Her testimony therefore met the
requirements of Texas Rule of Evidence 901, and the trial court did not abuse
its discretion by admitting the exhibits containing photographs of Eric.  We overrule Michael=s fifth
point.

IX.  Conclusion

Having overruled Michael=s ten
points, we affirm the trial court=s order
terminating his parental rights to Matt, John, and Eric.

 

SUE
WALKER

JUSTICE

 

PANEL: HOLMAN, WALKER,
and MCCOY, JJ.

 

DELIVERED:  December 18, 2008

 











[1]See Tex. R. App. P. 47.4.





[2]Pursuant to Texas Rule of
Appellate Procedure 9.8(b)(2), we use aliases for the names of the children.





[3]Molly=s father was Kevin H.,
and he signed an affidavit relinquishing his parental rights to Molly.  Molly is not Michael=s biological child, so he
is not asserting any rights to her. 
However, because she was in the home, we include her information when it
is relevant.





[4]During the course of CPS=s investigation, Melisa=s mom said that Michael
would not allow her to see Eric, and two people who were interviewed who were
close to Michael and Melisa admitted that they had not been permitted to see
Eric.  The person who reported the family
to CPS said that Eric was kept hidden in the bedroom. 





[5]A neighbor had initiated
the call after attempting to check on the children and being turned away by
Melisa. 





[6]Although this person is
referred to at various points in the record as AMaria,@ the evidence indicates
that this is a mistake and that the correct name is Melisa.





[7]The record included
photographs from February 1, 2007, showing Eric=s malnourished state. 





[8]The medical records also
stated that Michael reported that he fed Eric the previous night and that he
took the whole bottle. 





[9]Nick said that a criminal
case is being investigated but that charges had not been filed at the time of
the termination trial. 





[10]Weaver testified that her
understanding was that Michael was on probation during this case for an
aggravated assault charge from a prior year. 
However, the record reflected that Michael was placed on deferred
adjudication for criminal mischief and that there was a plea in bar on
aggravated assault. 





[11]On the day that Weaver asked
Michael to take a drug test, she had concerns because his behavior was
considerably different than it had been in the past, and she wanted to rule out
substance abuse. 





[12]Eric was not allowed to
participate in visitations until he was healthy enough to do so and until his
parents started participating in their service plans.





[13]The trial court appointed
CPS as managing conservator of all the children, appointed Melisa=s parents possessory
conservators of Matt and Molly, and found that John and Eric are special needs
children who would benefit from remaining in their current placement and
possible adoption. 





[14]We have already ruled
that family code section 263.405(i) is void as a violation of the separation of
powers provision of the Texas constitution. 
See In re D.W., 249 S.W.3d 625, 645 (Tex. App.CFort Worth 2008, pet.
denied).